HAYES GRAIN COMPANY *v.* REA-PATTERSON MILLING COMPANY.

Opinion delivered July 5, 1920.

1. EVIDENCE—CONTEMPORANEOUS WRITINGS.—Letters and telegrams between the parties contemporaneous with the written memorandum of a sale, and intended by the parties to be considered as part of the contract, are admissible to show the terms of the contract.

2. SALES—DESCRIPTION OF GRAIN.—Parties to a contract for the sale of corn in interstate commerce are not prohibited, under Barnes' Federal Code, § 8194, and departmental regulations thereunder, from adding to the grade of corn prescribed thereby requirements that the corn should be white and kiln-dried, and the seller can not recover on tender of corn which does not meet such requirements.

Appeal from Pulaski Circuit Court, Third Division; *G. W. Hendricks,* Judge; affirmed.

*Mehaffy, Donham & Mehaffy,* for appellant.

All the prior correspondence and negotiations were merged in the contract of purchase as written. 104 Ark. 475; 83 *Id.* 283, 105; 80 *Id.* 805; 21 *Id.* 69; 30 *Id.* 186; 99 *Id.* 218; 78 Atl. 300; 89 N. E. 723; 13 C. J. 544; 110 N. Y. S. 4999. The defense of appellee that the corn tendered by appellant was not suitable for milling purposes was not a good defense, as (1) the contract does not call

for corn suitable for milling purposes, and (2) the Federal statute prevents the making of such a contract.

*Coleman, Robinson & House*, for appellee.

1. The appellant bases his argument on a contract covering certain cars which are not involved in this case, and fails to mention another contract entirely different which covers the three cars in controversy. It treats the memorandum as the exclusive contract, but neither the contract referred to nor the cars shipped under are at issue in this cause. This case turns on three cars of corn which appellants has on its industrial track at Fort Smith, with reference to which the parties made a new and independent contract, evidenced by telegrams and letters. The appellant is entirely wrong in its construction of the Federal grain standards act. That statute does not prohibit the contract the parties actually made by telegrams and letters.

2. The case was submitted to the court sitting as a jury and it found the issues in favor of appellee. This is as conclusive as the verdict of a jury. 53 Ark. 61; 86 *Id.* 504; 90 *Id.* 494; 107 *Id.* 106; 114 *Id.* 170. The finding will not be disturbed if supported by any evidence. 82 Ark. 188, 260; 84 *Id.* 623. Appellant contends that the contract in legal effect called for No. 3 white corn; that the descriptive terms, "choice" and "kiln-dried," are superfluous words and therefore excluded; that the testimony shows that when corn on a western terminal market under a contract which does not specify the place of grading, the grade at the point of origin and not delivery controls; that the contract does not specify the place where the grading was to be made; and that the corn was graded at Omaha by a Federal inspector as No. 3 white, and that is conclusive. The appellant is in error as to the law and facts. As there is no Federal inspector at Fort Smith, under the rules and customs of trade, the grade is determined by inspection at the place of delivery. The department of the United States has so ruled. There is no merit in the appeal, as the case was tried at law be-

fore the court sitting as a jury, and the finding is conclusive.

SMITH, J. Appellant alleged in its complaint that it sold to the defendant (appellee) on April 3, 1918, three cars of No. 3 white corn, f. o. b. St. Joseph, Missouri, or points taking same rates, to Coffeyville, Kansas. That said cars were delivered in accordance with the contract of purchase, but upon delivery of same appellee refused to receive them, whereupon appellant sold said cars of corn for appellee's account for $1,874.35 less than the contract price, for which sum this suit was brought. There was a trial before the court sitting as a jury, and a finding for appellee, and judgment accordingly, from which comes this appeal.

The contract was negotiated and consummated as a result of conversations over the telephone, telegrams, and letters confirming these conversations and telegrams. Appellee was in the milling business, and could use only milling corn, and emphasized that fact in the telephone conversations and also in its telegrams and letters. The contract finally entered into was concluded and evidenced as follows: Appellant called appellee on the 'phone on April 3, 1918, and advised that it had three cars of corn coming out of St. Joseph, Missouri, and three out of Omaha, and as it did not then need the corn, asked appellee to take the corn off its hands. In this conversation appellee's representative stated that it did not need any corn, and only used corn which made a high grade of meal, but advised that appellee would wire the next day what it could do. Pursuant to this promise the following telegram was sent the next day: "Name your best price five cars choice three white milling corn f. o. b. St. Joseph." Appellant replied by wire, "Fix your own price." Appellee wired back, "Bought three white today basis $1.76, St. Joseph. Will book your six cars same basis. Best can do. Subject to immediate acceptance by wire." Appellant replied, "Booking the six cars for you price named. Thank you for helping us out." And on

the same day appellee wrote: "Confirming our exchange of wires today, we are booking you six cars choice 3 white kiln-dried, shelled white corn, at $1.76 basis f. o. b. St. Joseph, Mo." Enclosed in this letter were six memoranda, each for one car, in the following form:

"Purchase Contract.      Coffeyville, 4-3-1918.

"Hayes Grain Company, Fort Smith, Arkansas.

"We confirm purchase of you by wire, your Mr. _____talking to our Mr._____ as follows:

"One car containing capacity bushels, choice 3 white kiln-dried corn at $1.76 per bu. f. o. b. St. Joseph, Mo., or points taking same rate to _____ Federal grades, Federal weights, shipment within ten days via Missouri Pacific. If no objection is made to this contract immediately by wire, same shall be considered final."

It is the insistence of appellant that the writing set out above and designated "Purchase Contract" is the exclusive contract between the parties, and that all prior conversations and communications are merged into it and cannot, therefore, be considered; and further that the adjectives, "white" and "kiln-dried," describing the corn, must be treated as suplusage, for the reason that only the specified grade of corn can be considered under the rulings of the Department of Agriculture putting in force the act of Congress regulating the sale and shipment of grain in interstate commerce.

The contract described the corn as 3 white, and appellant insists that any inquiry concerning the grade of the corn is limited to determining whether it graded "No. 3 white" at the time and place of the proposed delivery.

We cannot agree, however, that the memorandum set out above is the sole evidence of the contract. Upon the contrary, the final contract for the purchase of the three cars which form the subject-matter of this litigation was consummated by telegrams set out below sent and received on the following day. On April 4 appellant wired appellee, "Two cars our three white corn from Omaha were shipped and passed Coffeyville before our instructions reached our shippers. Will it be satisfactory for us

to have Missouri Pacific move them back there if we pay additional freight? Also have three more cars same corn here on track and will be glad if you can use them for us. Please advise." In reply, appellee wired, "Can use the two cars white corn from Omaha, which have passed Coffeyville if you pay extra freight charges, and the three cars in Fort Smith at $1.76, St. Joseph. You pay out of line haul. All corn to be good three white milling corn. Subject to immediate acceptance by wire." The appellant wired back, "Thank you, will bill the five cars to you $1.76, basis St. Joseph, we absorbing additional freight account cars coming here."

On the same day appellee wrote the appellant as follows: "Confirming exchange of wires today, we are booking you three cars of good No. 3 white shelled corn, kiln-dried, suitable for milling purposes, at $1.76 f. o. b. St. Joseph, Mo. * * * It is also understood two of the cars we purchased from you yesterday have passed Coffeyville and will be returned to us, all extra freight charges being absorbed by yourselves. You, of course, understand we buy white corn for milling purposes only, and expect a good quality of corn. We enclose herewith confirmation covering the purchase today of the three cars now in Fort Smith."

Appellee's offer was to buy milling corn, and the acceptance of that offer was unqualified. Appellant says, however, that, as the term "milling corn" does not appear in what is designated as the written contract, appellee cannot be heard to say that there was such a condition. Appellant says this result is reached by the application of the doctrine that antecedent propositions, correspondence and prior writings, as well as oral statements and representations, are deemed to be merged into the written contract which concerns the subject-matter of such antecedent negotiations when it is free of ambiguity and complete.

We think, however, that the rule does not apply here, because the letters and telegrams are contemporaneous writings with the memoranda which appellant

designates as the contract; and we think it manifest that the parties intended that they should be so considered. They were all in the hands of appellant before it shipped the corn. *Mann* v. *Urquhart,* 89 Ark. 248. Besides, as we have shown, the final contract of sale was concluded the day after this memoranda of sale was signed by appellee and mailed to appellant.

Moreover, the very memorandum itself describes the corn as "choice 3 white kiln-dried corn," and the testimony shows that the corn in controversy was not choice kiln-dried corn, although it did, in fact, grade "No. 3 white," and ordinarily this fact would have justified appellee in refusing to accept the corn. Appellant says, however, that it was unlawful, under the United States Grain Standard Act, for the appellee to purchase for shipment in interstate commerce under any designation except by grade, and that all other descriptive terms must be rejected as surplusage, and that the only question to consider is whether the corn would have graded "No. 3 white" at the time and place of the proposed delivery.

The Department of Agriculture was charged with the duty under the act of Congress of making and promulgating the necessary rules and regulations to govern the sale and shipment of different grains in interstate commerce. Section 8194, Barnes' Federal Code. The purpose being that the wants and needs of all persons dealing in grain may be made known by the use of grades designated by the department, and corn was classified into seven grades.

In the Service and Regulatory Announcements, promulgated by the Department of Agriculture, Bulletin No. 18, page 4, in answering the question whether the term "dry corn" might be used in connection with its grade designation, the department made the following ruling: Section 4 of the act requires as a condition to the shipment or delivery for shipment in interstate or foreign commerce of any grain for which standards shall have been established thereunder, which is sold, offered for sale, or consigned for sale, be one of the grades fixed

therefor in the official grain standards of the United States." Section 4 further provides: "No person shall in any certificate or in any contract or agreement of sale or agreement to sell by grade, either oral or written, involving, or in any invoice or bill of lading or other shipping document relating to the shipment or delivery for shipment, in interstate or foreign commerce, of any grain for which standards shall have been fixed and established under this act, describe, or in any way refer to, any of such grain as being of any grade other than a grade fixed therefor in the official grain standards of the United States.

"In the class of cases covered by the statute it appears that it is necessary, in stating the grade of the grain, to use the true designations of the official grain standards of the United States as prescribed therefor. It also appears that it would be a violation of the act to use, in addition to such designations, any term or statement in conflict or inconsistent with the official standards.

"On the other hand, it is the opinion of this office that, in addition to the true designations of grade according to the official grain standards of the United States, it would be permissible to include explanatory terms or statements independent of the grade of the grain. If the terms 'crop 1916' and 'dried corn,' as they *prima facie* indicate, are used merely in this explanatory sense, it is believed that they may be added to the true grade designations without violating the act. However, these terms should not be made a part of the grade designation as in the example you cite of 'No. 2 dried corn,' but should be added in such a way as clearly to indicate their explanatory nature, as for instance, 'No. 2 mixed corn, dried.' "

Of course, these departmental rulings are no part of the law; but we do not interpret the ruling as sustaining appellant's contention that the explanatory words "choice" and "kiln-dried" must be treated as surplusage. The department appears to hold that it is not a violation of the Federal act to add prefixes and

suffixes to the terms designating the official grade, provided such explanatory words are not false or misleading as to the official grade of the grain.

This appears to be the fair and reasonable construction to give the act of Congress, as the testimony at the trial was to the effect that a wide difference may exist in corn falling within the same official classification or grade. The official inspector at Coffeyville, Kansas, who inspected the corn in question, testified at the trial and exhibited to the court three pans of corn, all of which graded No. 3 white; yet he explained that one pan was suitable for milling, and another pan was not, for the reason that it would color the meal.

On December 1, 1916, the Department of Agriculture was asked whether the following classification was permissible under the Federal act: "Yellow milling corn, subject to discount for moisture over 17½ per cent?" After expressing the opinion that the provisions of the act were applicable to transactions involving the delivery for shipment in interstate commerce of shelled corn that was sold or consigned for sale by any grade whatever, the department ruled that "It would seem that your transactions could easily be so framed as to state the grade of the corn involved, according to the grades of the official grain standards of the United States, and that at the same time you could make the specific requirements which must be met by corn of the designated grade for the purposes of your business."

We think this ruling conforms to our interpretation that it was not the intention of the statute to deprive persons of the right to contract for specific requirements, provided the specifications employed were not false or misleading and conformed to the classifications previously adopted by the department.

We conclude, therefore, that the requirement of the memorandum that the corn should be "choice" and "kiln-dried" did not offend against the provisions of the Federal statute and are not to be disregarded as surplusage. The judgment of the court below is, therefore, affirmed.